UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| TYLER JOHNSTON, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>LIFEMD, INC., JUSTIN SCHREIBER, and MARC BENATHEN,<br><br>Defendants. | Case No:<br><br>CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br>JURY TRIAL DEMANDED |

Plaintiff Tyler Johnston ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, among other things, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, public filings, wire and press releases published by and regarding LifeMD, Inc. ("LifeMD" or the "Company"), and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. [1]

**NATURE OF THE ACTION**

---

[1] Unless otherwise stated, all emphasis is added.

1

1. This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded LifeMD securities between May 7, 2025 and August 5, 2025, inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

3. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

4. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district.

5. In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants (defined below), directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6. Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased LifeMD securities during the Class Period and was economically damaged thereby.

7. Defendant LifeMD has stated the following about its business:

LifeMD is a leading provider of virtual primary care. LifeMD offers telemedicine, access to laboratory and pharmacy services, and specialized treatment across more than 200 conditions, including primary care, men's and women's health, weight management, and hormone therapy.

8. Defendant LifeMD is incorporated in Delaware and its head office is located at 236 Fifth Avenue, Suite 400, New York, NY 10001.

9. LifeMD's common stock trades on The Nasdaq Global Market ("NASDAQ") under the ticker symbol "LFMD".

10. Defendant Justin Schreiber ("Schreiber") served as the Company's Chief Executive Officer ("CEO") and Chairman of the Board of Directors (the "Board") at all relevant times.

11. Defendant Marc Benathen ("Benathen") has served as the Company's Chief Financial Officer at all relevant times.

12. Defendants Schreiber and Benathen are collectively referred to herein as the "Individual Defendants."

13. Each of the Individual Defendants:

    (a) directly participated in the management of the Company;

    (b) was directly involved in the day-to-day operations of the Company at the highest levels;

    (c) was privy to confidential proprietary information concerning the Company and its business and operations;

    (d) was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e) was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f) was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g) approved or ratified these statements in violation of the federal securities laws.

14. LifeMD is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

15. The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to LifeMD under *respondeat superior* and agency principles.

16. Defendant LifeMD and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Materially False and Misleading Statements Issued During the Class Period

17. On May 6, 2025, after the market opened, LifeMD issued a press release entitled "LifeMD Reports First Quarter 2025 Results and Raises Full-Year 2025 Guidance" (the "Q1 Release").

18. The Q1 Release quoted Defendant Schreiber as stating the following:

LifeMD had an outstanding first quarter that demonstrated the power of our platform, the need for our services and the accelerated growth trajectory of the business as we achieved our first-ever quarter of GAAP profitability well ahead of expectations. ***During the quarter we expanded across all service areas, and the performance of our weight management program underscored our success as it is now expected to exceed top- and bottom-line expectations for the full year***. The launch of our men's hormone

therapy offering, and recent acceptance of Medicare are also off to strong starts and continue to diversify our already leading telehealth platform

19. Further, he stated the following:

***Our recently announced strategic collaborations with both LillyDirect and NovoCare continue to generate momentum by allowing us to offer more convenient and affordable access to branded GLP-1 medications.*** These collaborations make LifeMD the only telehealth provider in the U.S. that offers synchronous care and cash-pay access to both Wegovy® and Zepbound®. In addition to the continued success of our existing telehealth platforms, we recently announced key hires in the mental and hormonal health verticals and the acquisition of important assets in behavioral health and women's health. These are two strategic areas with significant unmet clinical need in the marketplace and within our existing patient population

20. The Q1 Release quoted Defendant Benathen as stating the following:

LifeMD had an exceptionally strong first quarter with top- and bottom-line growth both ahead of our expectations. Telehealth revenue achieved 70% year-over-year growth on a standalone basis, while our telehealth adjusted EBITDA increased to $5.3 million from a loss of $1.3 million in the year-ago period. We also achieved positive GAAP net income for the first time[.] ***We are raising our full-year 2025 guidance to reflect our strong performance to date for both revenue and adjusted EBITDA. We now expect total revenues in the range of $268 to $275 million, up from $265 to $275 million, and adjusted EBITDA in the range of $31 to $33 million, up from $30 to $32 million***

21. The statements in ¶¶ 18-20 were materially false and misleading at the time they were made because Defendants recklessly issued heightened 2025 guidance, as Defendants did not properly account for increased customer acquisition costs in its RexMD business, as well as customer acquisition costs associated with selling drugs designed to treat obesity, such as Wegovy and Zepbound.

22. The Q1 Release stated that "[f]or the full year 2025, due to the outperformance of its telehealth business in the first quarter the Company is raising its guidance to" and then provided the following figures:

- Total revenues in the range of $268 million to $275 million, up from previous guidance of $265 million to $275 million.
- Telehealth revenue in the range of $208 million to $213 million, up from $205 million to $213 million.

5

- Adjusted EBITDA in the range of $31 million to $33 million, up from $30 million to $32 million.
- Telehealth adjusted EBITDA is now forecast to exceed $21 million, up from approximately $20 million previously.

23. The statement in ¶ 22 was materially false and misleading at the time it was made because Defendants recklessly issued heightened guidance that LifeMD was unlikely to achieve, given that its competitive position was not as strong as Defendants led investors to believe.

24. On the same day, LifeMD conducted its Q1 2025 Earnings Call (the "Q1 Call"). Defendant Benathen reiterated on the Q1 Call that LifeMD was raising its guidance for 2025 "***due to the outperformance of our Telehealth business to-date.***"

25. Defendant Schreiber made the following statement on the Q1 Call:

Now I'll turn to our virtual primary care platform. As recently announced, we've established strategic collaborations with LillyDirect and NovoCare to improve access to GLP-1 medications for weight management patients without insurance coverage. These partnerships reflect the growing recognition of our patient-first model and underscore our ability to streamline access to transformative therapies.

LifeMD is now the only virtual care provider offering synchronous consults integrated with both NovoCare and LillyDirect, enabling seamless access to Wegovy and Zepbound. ***Combined with our direct-to-patient pharmacy, specialized nationwide provider network and pharmacy benefits infrastructure, we believe we've created a category-defining competitive moat in virtual obesity care***. It's worth noting that we expect to do exactly the same thing in many other verticals in the years to come.

26. Defendant Schreiber further stated the following on the Q1 Call:

***Our RexMD brand continues to perform exceptionally well, with consistent growth in both revenue and active patient count***, further reinforcing its position as a category leader in men's health.

As we previously guided, we continue to expand Rex beyond its original focus on sexual health into larger, high-demand verticals, including weight management, behavioral health, insomnia and hormone replacement therapy.

Our newly launched HRT program is off to a strong start with early adoption, exceeding expectations and offering valuable insights into this fast-growing category. Notably, more than 40% of new HRT patients are existing RexMD patients already engaged in another care subscription.

6

*Later this year, we plan to introduce LifeMDPlus and other synchronous care offerings to RexMD's 180,000 active patients, unlocking a significant cross-care opportunity across our ecosystem*.

27. Defendant Schreiber further stated:

*As we conclude our prepared remarks, I want to underscore how energized we are by LifeMD's strong start to 2025*. Our first quarter performance reflects disciplined execution against our strategic priorities and the early traction we're seeing across key initiatives gives us strong confidence in our trajectory for the remainder of the year.

The programs we've launched, including the expansion of our benefits infrastructure, strategic collaborations with GLP-1 manufacturers, new RexMD offerings, and our entry into the women's and behavioral health space are all aligned with our near-term vision to build a trusted, vertically integrated marketplace for healthcare services, prescription medications and over-the-counter healthcare products.

28. The statements in ¶¶ 24-27 were materially false and misleading at the time they were made because Defendants materially overstated LifeMD's business prospects (including RexMD's prospects, as well as its new business of selling drugs such as Wegovy and Zepbound) while simultaneously recklessly raising 2025 guidance.

29. The Q1 Call included the following exchange:

**Analyst:** Hi. Congrats on the great quarter and thank you for taking the questions. So first just looking at your guidance for Telehealth, like raising the lower end for revenues following a strong quarter. This looks like you're spending Telehealth to be roughly flat sequentially. *Is this just being conservative or there's some headwinds that you're anticipating that will limit your ability to grow sequentially*.

**Defendant Benathen**: Yeah. No. It's not that there's headwinds. I mean there's some timing in the revenue that we have. I mean**, *we tend to take a relatively conservative view to revenue.* **We do normally expect and see that aspects of the Rex business and sexual health tend to be a little bit softer seasonally in Q2 than they are in Q1, which is what historically we've seen, particularly from new acquisition standpoints. We've baked that into our model also. But all that's pretty consistent with what we've seen in the past. Obviously, there's tremendous growth year-on-year and that's essentially how we're managing the business versus just managing for sequential growth every single quarter.

7

30. The statement from Defendant Benathen in ¶ 29 was materially false and misleading at the time it was made because, contrary to his representation, the heightened 2025 guidance was not "conservative." In fact, the heightened 2025 guidance would be impossible to achieve if even relatively normal or expected headwinds were to materialize.

31. The statements contained in ¶¶ 18-20, 22, 24-27, and 29 were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Defendants materially overstated LifeMD's competitive position; (2) Defendants were reckless in raising LifeMD's 2025 guidance, considering that they had not properly accounted for rising customer acquisition costs in LifeMD's RexMD segment, as well as for customer acquisition costs related to the sale of drugs designed to treat obesity, including Wegovy and Zepbound; and (3) as a result, Defendants' statements about LifeMD's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

32. On June 13, 2025, Stefan Galluppi, LifeMD's Chief Innovation Officer, sold 85,000 shares of LifeMD stock at an artificially raised price, raising $1,079,500.

33. On August 1, 2025, four days before the Company announced that it was lowering its full-year guidance, Defendant Schreiber sold 175,000 shares of LifeMD stock at artificially inflated prices, raising $1,821,750 in the process.

**THE TRUTH BEGINS TO EMERGE**

34. On August 5, 2025, after the market closed, the Company issued a press release entitled "LifeMD Reports Second Quarter 2025 Results." This announcement quoted Defendant

Benathen as stating that due to "some temporary challenges facing our Rex MD business," which he claimed were "largely resolved," that the Company was "*revising our full year 2025 guidance for revenue and adjusted EBITDA to reflect the full-year impact of these issues*, while still anticipating strong year-over-year growth in both metrics."

35. The Announcement stated the following about what financial ranges the Company now expected for 2025:

- Total revenue in the range of *$250 million to $255 million, compared with the previous guidance of $268 million to $275 million*.
- Telehealth revenue in the range of *$195 million to $200 million, compared with $208 million to $213 million previously*.
- Adjusted EBITDA in the range *of $27 million to $29 million, compared with $31 million to $33 million previously.*
- Telehealth adjusted *EBITDA is now forecast to be in the range of $14 million to $16 million, down from $21 million previously*.

36. On August 5, 2025, after the market closed, the Company held its Q2 2025 Earnings Call (the "Q2 Call").

37. Defendant Schreiber revealed the following on the Q2 Call:

Our weight management business remains robust, consistently attracting over 400 new patient sign-ups per day. Notably, we've seen a significant increase in patients accessing branded therapy options through our platform. Given current trends and the improvements we expect to see in pricing and insurance coverage, we expect that by year-end, the vast majority of new patients will be on an insurance covered GLP-1 therapy, an affordable cash-based therapy or one of our oral prescription therapies for weight loss.

*We continue to invest in improving the care platform that supports our weight management program.* This decision is validated by the fact that we are seeing a growing number of weight management patients using our platform to access non-weight-related health care services and products. *While our weight management segment did outperform our second quarter guidance plan for this segment, weight management has been impacted by a higher-than-anticipated refund rate driven by patients either lacking insurance coverage for their medications or being unable to afford the out-of-pocket cost of branded therapies*.

Although this is a near-term headwind, we are actively enhancing our new patient intake process to include real-time benefit verification and other key improvements. These

9

updates are designed to significantly improve the patient experience and drive higher conversion rates on to therapy. As part of these efforts, we are expanding access to a broader range of oral generic weight loss medications and adding liraglutide as a covered option. We remain highly confident in the long-term opportunity within prescription weight management. This is a large and underserved market, and we believe the steps we're taking will further strengthen our leadership position despite the temporary challenges.

38. Defendant Schreiber further disclosed the following:

***Turning to Rex. We experienced a challenging second quarter, primarily due to temporarily elevated customer acquisition costs in the highly competitive ED market***. However, we have since adjusted our marketing and product strategies and early third quarter data suggests a return to healthier customer acquisition levels. We remain confident in RexMD's long-term growth trajectory, especially as we continue to broaden our offerings into hormone replacement therapy, personalized compounded treatments for ED and hair loss as well as additional men's health categories.

39. In response to questions asking for further detail about acquisition costs, Defendant Schreiber stated the following:

[. . .] I'll just add, like remember, we [had an enormous transition], right, this past quarter with the weight management business, which just really required a lot of energy from almost everybody in the organization. And some of the -- we did see -- we obviously saw these changes [in the competitive environment], but some of it was just think we took our eye off the ball for a little bit, and it's -- we should have gotten this thing back online a little quicker, and we didn't. But again, as we try to -- as we communicated in the -- on the call earlier, like we feel really good about where the business is. There's a lot of exciting kind of new product opportunities for RexMD and we really want to communicate that this isn't something that we're going to -- we think we -- people should be concerned about going forward.

40. Defendant Benathen stated the following on the Q2 Call:

As Justin noted, our long-term financial outlook remains strong. Weight management, though experiencing some impact from higher refund rates from patients without coverage or for whom discounted cash pay pricing is still inaccessible, performed ahead of guidance plan in the second quarter.

New subscribers for weight management continued at strong levels and regularly exceeded 400 new patient sign-ups per day. WorkSimpli maintained its strong bottom line performance with quarterly adjusted EBITDA of nearly $3.7 million on a stand-alone basis. ***Our quarterly results were mostly impacted by temporary performance challenges impacting our RexMD business, which are largely behind us.***

10

41. Defendant Schreiber further stated that "*we weren't satisfied with our overall performance*[.]"

42. The Q2 Call included the following exchange, in which Defendant Benathen affirmed that the full-year guidance was down mostly as a result of issues with RexMD customer acquisition costs, even though he claimed that the issues had been resolved, further indicating the extent to which Defendants were reckless in raising 2025 guidance:

> **Analyst:** Just kind of as a follow-up to the last question. I just want to make sure I fully understand it. So the full year guide down, ***that's totally related to the dynamics faced with the RexMD business despite the fact that you guys now have that resolved***. Just want to get an understanding of any impact that we would see from that in Q3 and then more recently in Q4.
>
> **Benathen**: *Yes*. So the majority of it is related to that. There's a small proportion, as you mentioned, in the short term, there's some higher refund rates on the weight management patients. We're talking a few percentage points higher. That was a small proportion of the changes, which we've built into the Q2 and Q3 -- sorry, the Q3 guide.
>
> But the vast majority of it was the impact from performance in Rex in Q2 and then the downstream impact associated with less new subscribers that came in the door in Q2, retaining those people throughout the year and slightly softer sales performance than we had historically seen. Obviously, we're building back.
>
> But I'd say right now in terms of sales per day, we're at about 85% to 90% of where we've been historically, which is a big improvement over where we had been in the middle of Q2. But all of that is baked into the guidance. Now we've not assumed any potential complete rebound in Rex within that guidance. So we think we've taken a prudent point of view on that.

43. On this news, the price of LifeMD common stock fell $5.31 per share, or 44.8%, to close at $6.53 on August 6, 2025.

44. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

45. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who acquired LifeMD securities publicly traded on the NASDAQ during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of LifeMD, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

46. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, LifeMD securities were actively traded on NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

47. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

48. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

49. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of LifeMD;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether the Defendants caused LifeMD to issue false and misleading filings during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false filings;

- whether the prices of LifeMD securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

50. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

51. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- LifeMD shares met the requirements for listing, and were listed and actively traded on NASDAQ, an efficient market;

- As a public issuer, LifeMD filed periodic public reports;

- LifeMD regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

- LifeMD' securities were liquid and traded with moderate to heavy volume during the Class Period; and

- LifeMD was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

52. Based on the foregoing, the market for LifeMD securities promptly digested current information regarding LifeMD from all publicly available sources and reflected such information in the prices of the shares, and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

53. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

## COUNT I
## For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder
## Against All Defendants

54. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

55. This Count is asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

56. During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

57. Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of LifeMD securities during the Class Period.

58. Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of LifeMD were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of LifeMD, their control over, and/or receipt and/or modification of LifeMD' allegedly materially misleading statements, and/or their associations with the Company which made them privy to

confidential proprietary information concerning LifeMD, participated in the fraudulent scheme alleged herein.

59. Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other LifeMD personnel to members of the investing public, including Plaintiff and the Class.

60. As a result of the foregoing, the market price of LifeMD securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of LifeMD securities during the Class Period in purchasing LifeMD securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

61. Had Plaintiff and the other members of the Class been aware that the market price of LifeMD securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased LifeMD securities at the artificially inflated prices that they did, or at all.

62. As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

63. By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members

of the Class for substantial damages which they suffered in connection with their purchase of LifeMD securities during the Class Period.

## COUNT II
### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

64. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

65. During the Class Period, the Individual Defendants participated in the operation and management of LifeMD, and conducted and participated, directly and indirectly, in the conduct of LifeMD' business affairs. Because of their senior positions, they knew the adverse non-public information about LifeMD's business practices.

66. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to LifeMD' financial condition and results of operations, and to correct promptly any public statements issued by LifeMD which had become materially false or misleading.

67. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which LifeMD disseminated in the marketplace during the Class Period concerning LifeMD' results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause LifeMD to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of LifeMD within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of LifeMD securities.

68. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by LifeMD.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff, on behalf of himself and the Class, prays for judgment and relief as follows:

(a) declaring this action to be a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating plaintiff's counsel as Lead Counsel;

(b) awarding damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

awarding plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) awarding plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: August 27, 2025

THE ROSEN LAW FIRM, P.A.
/s/ Phillip Kim
Phillip Kim, Esq.
Laurence M. Rosen, Esq.
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: philkim@rosenlegal.com
         lrosen@rosenlegal.com

*Counsel for Plaintiff*